JUDGE KOELTL

**COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.**
Lynda J. Grant (LG-4784)
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

07 CV 10687

**KELLER ROHRBACK L.L.P.**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
Tyler L. Farmer
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

*Counsel for Plaintiffs*
(additional counsel on signature page)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARL ESPOSITO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MERRILL LYNCH & CO., INC., E. STANLEY O'NEAL, CAROL T. CHRIST, ARMANDO M. CODINA, VIRGIS W. COLBERT, JILL K. CONWAY, ALBERTO CRIBIORE, JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, DAVID K. NEWBIGGING, AULANA L. PETERS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O. ROSSOTTI, LOUIS DIMARIA, PETER STINGI and JOHN AND JANE DOES 1-20. <br><br> Defendants. | Case No. <br><br> **CLASS ACTION** |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT**

## I. INTRODUCTION

1.     Plaintiff Carl Esposito ("Plaintiff") alleges the following based upon personal information as to himself and the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company"), including Merrill Lynch's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Merrill Lynch 401(k) Savings and Investment Plan (the "SIP"), a review of the Forms 5500 filed by the SIP, the Merrill Lynch Retirement Accumulation Plan (the "RAP"), and the Merrill Lynch Employee Stock Ownership Plan (the "Traditional ESOP") (collectively the "Plans") with the U.S. Department of Labor, interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

2.     This is a class action brought on behalf of the Plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plans for violations of ERISA.

3.     The Plans are retirement plans sponsored by Merrill Lynch.

4.     Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from January 18, 2007 to the present (the "Class Period").

5.      Plaintiff alleges that Defendants allowed the heavy, imprudent investment of the Plans' assets in Merrill Lynch common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to Company's serious mismanagement and improper business practices, including, among other practices: (a) rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks; (b) persisting in its aggressive growth of the Collateralized Debt Obligations ("CDO") business, despite clear indicators, including its own projections, weighing against continued growth; and (c) inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions, all of which caused Merrill Lynch's financial statements to be misleading and which artificially inflated the value of shares of Merrill Lynch stock and the Merrill Lynch Stock Fund in the Plans ("Fund"). In short, during the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that rendered Merrill Lynch stock an unduly risky and inappropriate investment option for participants' retirement savings.

6.      Specifically, Plaintiff alleges in Count I that the Defendants who were responsible for the investment of the Plans' assets breached their fiduciary duties to the Plans' participants in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Merrill Lynch stock. In Count II, Plaintiff alleges that the Defendants, who were responsible for the selection, monitoring and removal of the Plans' other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiff alleges that the Defendants breached their duty to inform the Plans' participants by failing to provide complete and accurate information regarding the

2

soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity. In Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

7.     As more fully explained below, during the Class Period, Defendants imprudently permitted the Plans to hold and acquire billions of dollars in Merrill Lynch stock despite the fundamental problems the Company faced. Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans to lose nearly *2 billion dollars* of retirement savings.

8.     This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.     ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiff to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Merrill Lynch common stock during the Class Period.

10.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's

allegations are made by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

### III.  JURISDICTION AND VENUE

11.    **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Merrill Lynch has its principal place of business in this district.

### IV.  PARTIES

**A.    Plaintiff**

14.    Plaintiff Esposito is a resident of Suffolk, New York. He worked for Merrill Lynch beginning in December, 1989, and left the Company in July, 2002. He is a current participant in the SIP, the Traditional ESOP, and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

**B.    Defendants**

15.    **Defendant Merrill Lynch & Co, Inc.**  Merrill Lynch, a Delaware corporation, is a holding company with its principal place of business at 4 World Financial Center, 250 Vesey Street, New York, New York.  Merrill Lynch is one of the world's largest wealth management, capital markets, and advisory companies with approximately $1.8 trillion in assets under management.  The Company has over 55,000 employees in its three major business segments: Global Markets and Investment Banking; Global Private Client; and Global Wealth Management.  On September 29, 2006, Merrill Lynch completed the merger of its Merrill Lynch Investment Managers business with BlackRock, Inc.  The Company owns a 45% voting interest and approximately half of the economic interest of BlackRock.  Merrill Lynch common stock is listed on the New York Stock Exchange and trades under the ticker symbol "MER."

16.    **Director Defendants.** The Merrill Lynch Board of Directors (hereinafter the "Board") is the governing body of Merrill Lynch under its charter, its bylaws, and applicable Delaware law.  On information and belief the members of the Board during the Class Period included:

a.    **Defendant E. Stanley O'Neal** has served as a Director of Merrill Lynch from 2001 until his retirement effective October 30, 2007.  Defendant O'Neal also served as the Company's Chief Executive Officer from December 2002 until his retirement.

b.    **Defendant Carol T. Christ** has served as a Director of Merrill Lynch since 2007.

c.    **Defendant Armando M. Codina** has served as a Director of Merrill Lynch since 2005.

d.    **Defendant Virgis W. Colbert** has served as a Director of Merrill Lynch since 2006.

e.    **Defendant Jill K. Conway** served as a Director of Merrill Lynch from 1978 to 2007.

f.    **Defendant Alberto Cribiore** has served as a Director of Merrill Lynch since 2003.

g.    **Defendant John D. Finnegan** has served as a Director of Merrill Lynch since 2004.

h.    **Defendant Judith Mayhew Jonas** has served as a Director of Merrill Lynch since 2006.

i.    **Defendant David K. Newbigging** served as a Director of Merrill Lynch from 1996 to 2007.

j.    **Defendant Aulana L. Peters** has served as a Director of Merrill Lynch since 1994.

k.    **Defendant Joseph W. Prueher** has served as a Director of Merrill Lynch since 2001.

l.    **Defendant Ann N. Reese** has served as a Director of Merrill Lynch since 2004.

m.    **Defendant Charles O. Rossotti** has served as a Director of Merrill Lynch since 2004.

17.    As is explained in more detail below, the Board had certain responsibilities with respect to the Plans, including oversight responsibilities, and the Board and its members were

therefore fiduciaries of the Plans.  The Board and its members listed above are referred to as the "Director Defendants."

18.    **Management Development and Compensation Committee Defendants.** As explained in more detail below, the Management Development and Compensation Committee ("Compensation Committee") is appointed by the Board and had responsibility for various oversight responsibilities.  The Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants."   On information and belief, the Compensation Committee Defendants are as follows:

a.    **Defendant Alberto Cribiore** has served as a member of the Compensation Committee.

b.    **Defendant Armando M. Codina** has served as a member of the Compensation Committee.

c.    **Defendant Virgis W. Colbert** has served as a member of the Compensation Committee.

d.    **Defendant Jill K. Conway** served as a member of the Compensation Committee during the Class Period.

e.    **Defendant John D. Finnegan** has served as a member of the Compensation Committee.

f.    **Defendant Aulana L. Peters** has served as a member of the Compensation Committee.

19.    **Senior Vice President, Leadership and Talent Management.**  As explained in more detail below, the Senior Vice President, Leadership and Talent Management had certain fiduciary responsibilities with respect to the Plans.

20.     On information and belief, **Defendant Peter Stingi** served as the Senior Vice President, Leadership and Talent Management during the Class Period.

21.     The identity of another person(s) who may have served as Senior Vice President, Leadership and Talent Management during the Class Period is currently unknown to Plaintiff, and is therefore named fictitiously as John or Jane Doe 1. Once the identity of John or Jane Doe 1 is ascertained, Plaintiff will seek leave to join him/her under his/her true name.

22.     Defendant Stingi and John and Jane Doe 1 are referred to as the "Senior Vice President, Leadership and Talent Management Defendant."

23.     **Senior Vice President, Human Resources.** As explained in more detail below, the Senior Vice President, Human Resources had certain fiduciary responsibilities with respect to the Plans, including appointment and oversight responsibilities.

24.     The identity of the Senior Vice President, Human Resources Defendant is currently unknown to Plaintiff and is therefore named fictitiously as John or Jane Doe 2. Once the identity of this HR Defendant is ascertained, Plaintiff will seek leave to join him/her under his/her true name.

25.     **Administrative Committee Defendants.** As explained more fully below, the Plans assigned certain fiduciary responsibilities and duties to the Administrative Committee. The Administrative Committee members have full authority and power to administer and construe the Plans. On information and belief, the individual Administrative Committee Defendants are as follows:

      (a).     **Defendant Louis DiMaria** has served as a member of the Administrative Committee.

26.     The identities of the remaining members of the Administrative Committee are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 3-10.

Once the identities of additional Administrative Committee members are ascertained, Plaintiff will seek leave to join them under their true names. The Administrative Committee and its members (Defendant DiMaria and John and Jane Does 3-10) are referred to as the "Administrative Committee Defendants."

27. **Investment Committee Defendants**. As explained in more detail below, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds. The identities of the Investment Committee Defendants are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 11-20. Once the identities of the Investment Committee Defendants are ascertained, Plaintiff will seek leave to join them under their true names. The Investment Committee Defendants (John and Jane Does 11-20) are referred to as the "Investment Committee Defendants."

## V. THE PLANS

28. The Plans, sponsored by Merrill Lynch, are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither defendants nor plaintiffs. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

29. The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plans were held in trusts by Merrill Lynch Trust Company pursuant to the trust agreements. All contributions made to the Plans constitute a form of deferred compensation.

9

**A.    Merrill Lynch 401(k) Savings and Investment Plan.**

30.    The SIP became effective on October 1, 1987.  The purpose of the Plan is to encourage employees to save for retirement.  *See* Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, Annual Report (Form 11-K) at 4 (Dec. 31, 2006) (hereinafter the "2006 Form 11-K"); Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, As restated, including amendments adopted through December 9, 2005 (hereinafter the "SIP Plan Document").

31.    Employees are eligible to participate in the SIP at commencement of their employment.  2006 Form 11-K.

32.    Individual notional accounts are maintained for each SIP participant. Participants' accounts are credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.  *Id.*

33.    Throughout the Class Period, participants in the SIP were permitted to defer a percentage of their base compensation for investment in the Plan.  SIP participants are allowed to contribute between 1% and 25% of their base compensation, up to an annual maximum of $15,000.  *Id.*

34.    Prior to January 1, 2007, the Company matched 50% of the first 6% of a participant's contributions, up to an annual maximum Company contribution of $2,000, after one year of service.  Effective January 1, 2007, the Company matches 100% of the first 4% of a participant's contributions, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution is $2,000.  *Id.*

35.    Participants become fully vested in the Employer Contributions made to their Employer Contribution Subaccount upon the completion of five years of service.  SIP Plan Document § 4.1.3.

36.    Throughout the Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options (a.k.a. "Designated Investment Alternatives") that were made available to participants in the SIP for investment of their retirement savings.  The options consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund.  2006 Form 11-K at 7; SIP Plan Document § 11.1.1.

37.    The Merrill Lynch Stock Fund was not a required feature of the SIP.  Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision made by the Plan fiduciaries, by and through the Investment Committee Defendants. SIP Plan Document §§ 10.2.3(c) & 11.1.1.

38.    Nothing in the Plan limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

**B.    Merrill Lynch Retirement Program.**

39.    All U.S. employees of Merrill Lynch are eligible to participate in the Retirement Program after completing one year of service.

40.    Participants in the Retirement Program become 100% vested in their accounts after three years of service.

41.    Once an employee is eligible for the Retirement Program two accounts are set-up: the RAP and the Traditional ESOP.  Contributions to a participant's RAP and Traditional ESOP

account are based, in part, on their years of service and their eligible compensation. The maximum annual eligible compensation used to determine contributions is set by the Internal Revenue Service ("IRS"). This amount is $225,000 in 2007. Contributions range from 2% to 8% depending on a participant's years of service. Participants may not contribute their own funds to these accounts.

42.    The following is a summary of the steps taken by Merrill Lynch to determine if the Retirement Program contributions are made in the form of Company Stock and/or cash:

**Step 1: Annual Contributions**
Merrill Lynch looks at each participant's length of service as of each January 4 and his or her eligible compensation to determine the amount of annual contributions to each participant's Retirement Program accounts. Then, all of these contributions are added together to determine the total amount of annual contributions required.

**Step 2: Amount of Merrill Lynch Common Stock to Be Contributed**
Merrill Lynch determines the number of shares of Merrill Lynch common stock that will be contributed to participants' accounts for that year.

**Step 3: Market Value of Shares of Merrill Lynch Common Stock**
Merrill Lynch calculates the market value of the shares that will be contributed to participants' accounts (from Step Two). The market value of Merrill Lynch common stock is determined using the New York Stock Exchange closing price on the last business day of the year.

**Step 4: Determining the Percentage of Merrill Lynch Common Stock and/or Cash**
The market value of these shares is then divided by the total annual contribution amount (from Step One). The outcome of this calculation is a percentage – that percentage determines the split of cash and Merrill Lynch common stock that will be contributed to participants' accounts. For example, if the percentage is 7%, this means that 7% of that annual contribution will be made in Merrill Lynch common stock to ESOP accounts and 93% will be made in cash to RAP accounts.

*See* Retirement Chapter: Retirement Program Contributions.

1.    **RAP**

43.    The RAP became effective on January 1, 1989. The purpose of the Plan is to provide employees with a supplemental source of retirement income. *See* Merrill Lynch & Co., Inc. Retirement Accumulation Plan, As restated, including amendments adopted through December 9, 2005 (hereinafter the "RAP Plan Document").

44.    Merrill Lynch makes annual Retirement Contributions to the RAP utilizing the method described above. The Retirement Contributions to the RAP are in the form of Basic Credits. *Id.* at § 3.2. Basic Credits are varied based on a participant's years of service and are allocated in amount equal to a percentage of a participant's eligible compensation for the year in which they were a qualified participant. *Id.* For those who were participants in the RAP as of January 4, 1989, and met certain age requirements, the Company also makes Supplemental Credits and Additional Supplemental Credits to their accounts. *Id.* at § 3.3. The Company's contributions to the RAP are reduced by the value of Merrill Lynch shares allocated to the participant's Traditional ESOP account. *Id.* at § 3.5.

45.    In order for RAP participants to withdraw their Merrill Lynch stock held in their RAP accounts, participants must be vested and at least 59 ½ years old at the time of withdrawal if the ESOP shares in their RAP account were acquired as a result of Merrill Lynch contributions to the RAP and/or fund transfers to Merrill Lynch common stock. There are no withdrawal restrictions if the ESOP shares in their RAP account were transferred to the account from the Traditional ESOP. *Id.*

46.    Throughout the Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options that were made available to RAP participants for investment of their retirement savings. *Id.* §§ 5.1 & 8.3(c). The options consisted of various

mutual funds, and, in addition, the Merrill Lynch Stock Fund. Merrill Lynch 2006 Annual Report at 116.

47.    The Merrill Lynch Stock Fund was not a required feature of the RAP. Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision made by the Plan fiduciaries, by and through the Investment Committee Defendants. RAP Plan Document §§ 5.1 & 8.3(c).

48.    Nothing in the Plan limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

49.    Indeed, the Investment Committee has the discretion, prior to or after investment in one or more investment alternatives, to invest "all or a portion of the Trust Fund" in "short-term securities issued on an interim basis or guaranteed by the United States of America or any agency or instrumentality thereof or any other prudent investments of a short-term nature that earn income." *Id.* § 5.1

### 2.    Traditional ESOP

50.    The Traditional ESOP became effective on July 1, 1989.

51.    Merrill Lynch makes annual contributions to the Traditional ESOP as described above. Contributions to the Traditional ESOP are made in Merrill Lynch Common Stock. *See* Retirement Chapter: Retirement Program Contributions. On information and belief, participants do not exercise any authority or control over this investment decision.

52.    Upon completion of five years of service participants in the Traditional ESOP are able to diversify their account by: transferring their shares to their RAP account; rolling over to

an IRA or other tax-qualified retirement plan; transferring to a Merrill Lynch Brokerage Account; or by taking a cash distribution. *See* Retirement Chapter: ESOP Diversification.

**C.    ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

53.    In addition to the designation of the Traditional ESOP as a purported ESOP, the portions of the SIP and the RAP that invested in Merrill Lynch Common Stock are also designated as purported ESOPs. SIP Plan Document § 1.40; RAP Plan Document § 1.34.

54.    An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). On information and belief, the SIP and the RAP did not satisfy all of the statutory and regulatory mandates with respect to ESOP design and/or operation. For example, the SIP and RAP are not designed to invest primarily in qualifying employer securities in violation of 29 C.F.R. § 2550.4073-6(b).

55.    Even if the portions of the SIP and the RAP designated as ESOPs satisfy all of the applicable regulatory requirements for this designation, just like 401(k) plan fiduciaries generally, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

56.    Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP components of the SIP and RAP as well as for the Traditional ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**D.    The Plans Incurred Significant Losses during the Class Period.**

57.    During the Class Period, Merrill Lynch Common Stock represented significant portions of the Plans' assets.

15

58.     As of December 31, 2006, the SIP held approximately 16.4 million shares of Merrill Lynch stock, then having a market value of approximately $1.5 billion, and representing 28% of the net assets of the Plan. 2006 Form 11-K at 11.

59.     As of December 31, 2005, the RAP held approximately 14 million shares of Merrill Lynch stock, then having a market value of approximately $948 million, and representing 40% of the net assets of the Plan. RAP Form 5500 for year end Dec. 31, 2005 (available at http://www.freeerisa.com/5500/InstantView.asp?mainID=17317432).

60.     As of December 31, 2005, the ESOP held approximately 27 million shares of Merrill Lynch stock, then having a market value of approximately $1.76 billion, and representing 99% of the net assets of the Plan. Traditional ESOP Form 5500 for year end Dec. 31, 2005 (available at http://www.freeerisa.com/5500/InstantView.asp?mainID=17317433).

61.     The Plans have incurred substantial losses as a result of the Plans' investment in Merrill Lynch stock. Following revelations of the Company's serious mismanagement and improper business practices, including, among other practices: (a) rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks; (b) persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth; and (c) inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions, Merrill Lynch stock has declined approximately 45 percent since the beginning of the Class Period.

## VI. DEFENDANTS' FIDUCIARY STATUS

**A.    The Nature of Fiduciary Status.**

62.    **Named Fiduciaries.**    Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).    The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.    ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

63.    **De Facto Fiduciaries.**    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.    Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

64.    Each of the Defendants was a fiduciary with respect to one or all of the Plans and owed fiduciary duties to one or all of the Plans and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

65.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

17

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

66.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

67.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, on information and belief Merrill Lynch chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein. These persons and entities in turn selected Merrill Lynch employees, officers and agents to perform most fiduciary functions.

68.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.    Merrill Lynch's Fiduciary Status.**

69.    Pursuant to the SIP and RAP Plan Documents, the Company was the "Administrator" with respect to the SIP and the RAP, as those terms are defined in ERISA § 3(16)(A).  SIP Plan Document § 8.1.2; RAP Plan Document § 8.1.  Additionally, upon information and belief, the Company was also the "Administrator" with respect to the Traditional ESOP.

70.    Moreover, Merrill Lynch, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with

respect to the Plans, including the Investment Committee Defendants and Administrative Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Merrill Lynch is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

71.    Finally, under basic tenants of corporate law, Merrill Lynch is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Merrill Lynch.

72.    Consequently, in light of the foregoing duties, responsibilities, and actions, Merrill Lynch was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

73.    Merrill Lynch, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Merrill Lynch relied and continues to rely directly on the Director Defendants, the Compensation Committee Defendants, and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plans and ERISA.

C.    **The Director Defendants Fiduciary Status.**

74.    Under Delaware law and Merrill Lynch's charter and bylaws, the Board had the authority to manage the business and affairs of Merrill Lynch. Because Merrill Lynch was, as

alleged above, a fiduciary of the Plans during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Merrill Lynch.

75.    The Director Defendants are charged with the appointment, monitoring and removal of the Trustee and execution of the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plans.  SIP Plan Document at § 9.1.1; RAP Plan Document § 9.1.

76.    Moreover, upon information and belief, the Director Defendants are charged with the appointment of following Plan fiduciaries:  the Compensation Committee members; the Senior Vice President, Human Resources; and the Senior Vice President, Leadership and Talent Management.  Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendants; the Senior Vice President, Human Resources Defendant; and the Senior Vice President, Leadership and Talent Management Defendant.  Thus, according to Department of Labor regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

77. Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.    Compensation Committee Defendants' Fiduciary Status.**

78.    According to the Compensation Committee Charter the Compensation Committee Defendants had various responsibilities, including the following duties with respect to the Plans:

The Committee shall review overall policy regarding compensation and benefit programs that are generally available to employees and make such recommendations as it deems appropriate with respect to such programs;

The Committee shall review and approve changes to benefit plans that result in the issuance of stock or in a material change to the benefits being provided to employees. For these purposes, material change shall mean any change that results in an expense or an expense reduction representing 10% or more of the Company's total employee benefit plan costs or fundamentally alters the nature of the benefits provided by the plan; and

The Committee shall exercise any duties and responsibilities that are delegated to the Board or a committee of the Board by any retirement or benefit plan documents and shall have the power to delegate such duties to an appropriate officer of the Company.

Compensation Committee Charter at V. 3.

79.    The Compensation Committee was to report to the Board of Merrill Lynch following meetings of the Compensation Committee. *Id.* at III. 3.

80.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**E.    Senior Vice President, Leadership and Talent Management's Fiduciary Status.**

81.    Pursuant to the SIP and the RAP Plan Documents, the Senior Vice President, Leadership and Talent Management had the authority "to amend the Plan to implement trading restrictions on Participant or Beneficiary transactions involving Designated Investment Alternatives" which would include the Merrill Lynch Stock Fund. Amendment to § 11.15 SIP Plan Document; Amendment to § 5.1 RAP Plan Document.

82.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Senior Vice President, Human Resources Defendant was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

F.    **Senior Vice President, Human Resources Defendant's Fiduciary Status.**

83.    Pursuant to the SIP and the RAP Plan Documents, and, upon information the Traditional ESOP Plan Document, the Administrative Committee Defendants and the Investment Committee Defendants were appointed by the Senior Vice President, Human Resources.  SIP Plan Document § 10.1.1 and § 10.2.1; RAP Plan Document § 8.2 and § 8.3. Accordingly, the Senior Vice President, Human Resources had the duty to monitor, and to remove, the members Administrative Committee and the Investment Committee.  Thus, according to Department of Labor regulations, the Senior Vice President, Human Resources Defendant exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

84.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Senior Vice President, Human Resources Defendant was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

G.    **Administrative Committee Defendants' Fiduciary Status.**

85.    According to the Plan Documents for the SIP and the RAP, and, upon information

and belief, for the Traditional ESOP, the Administrative Committee is the "named fiduciary" of the Plans, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plans. SIP Plan Document § 8.1.1; RAP Plan Document § 8.1.

86.      Pursuant to the plan instruments, the Administrative Committee had the "exclusive authority and right to interpret the Plan provisions and to exercise discretion where necessary or appropriate in the interpretation and administration of the Plan and to decide any and all matters arising thereunder or in connection with the administration of the Plan…". SIP Plan Document § 10.1.3; RAP Plan Document § 8.2. At all relevant times, the "decisions, actions and records of the Administrative Committee [are] conclusive and binding….". SIP Plan Document § 10.1.3; RAP Plan Document § 8.2.

87.      In addition, the Administrative Committee has the following powers and duties:

(a).     The Administrative Committee shall have the power to promulgate such rules and procedures, to maintain or cause to be maintained such records and to issue such forms as it shall deem necessary or desirable for the administration of the Plan.

(b).     Subject to the terms of the Plan and applicable law, the Administrative Committee shall determine the time and manner in which all elections authorized by the Plan shall be made or revoked.

(c).     The Administrative Committee may direct that such amounts be withheld from any payment due under this Plan as required to comply with applicable income tax law.

(d).     The Administrative Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e).     The Administrative Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f).     The Administrative Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Administrative Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.1.3.

88.    On information and belief, in order to comply with ERISA, the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA. *See e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).    In this regard, on behalf of the Company, the Administrative Committee disseminated the Plan documents and related materials which, among other things, incorporated by reference Merrill Lynch's misleading Securities & Exchange Commission ("SEC") filings, thus converting such materials into fiduciary communications.

89.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Administrative Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## H.    Investment Committee Defendants' Fiduciary Status.

90.    According to the Plan Documents for the SIP and the RAP, and, upon information and belief, for the Traditional ESOP, the Investment Committee is the "named fiduciary" of the Plans for investment purposes as that term is defined under ERISA. SIP Plan Document § 8.1.1; RAP Plan Document § 8.1.

91.    In addition, the Investment Committee has the following powers and duties:

(a).    The Investment Committee shall establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.

(b).    The Investment Committee shall have the power to direct the assets of the Trust be held in a master trust consisting of assets of qualified plans maintained by the Company or an Affiliate.

(c).    The Investment Committee shall have the authority to establish Designated Investment Alternatives and permit the investment of Accounts in Company Stock....

(d).    The Investment Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e).    The Investment Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f).    The Investment Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Investment Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.2.3; RAP Plan Document § 8.3.

92.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VII.  FACTS BEARING ON FIDUCIARY BREACH

**A.    Merrill Lynch Stock Was an Imprudent Investment for the Plans during the Class Period Because of its Reckless Business Practices, Undisclosed Failure of Risk Management Systems and Related Handling of its Subprime Mortgage Assets**

**1.    Background.**

93.    During the Class Period, Merrill Lynch has been plagued by severe problems that made it imprudent for the Plans' fiduciaries to continue to offer Merrill Lynch stock as an

investment option for the Plans, match employee contributions in Merrill Lynch stock, and maintain the Plans' massive investment in the stock. As a result of these problems, discussed in detail below, Merrill Lynch stock posed an unduly large risk of significant loss and this risk is not one that could be prudently borne by employee retirement plans.

94.     These risks were exacerbated by false and misleading statements issued by Merrill Lynch that caused the price of Merrill Lynch stock to be artificially inflated. As the Department of Labor, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to invest Plan assets in artificially inflated stock.

95.     While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary has a duty of prudence which includes a duty not to ignore circumstances, such as those here, which increase beneficiaries' risk of loss and the overall magnitude of that potential loss to an imprudent and unacceptable level.

96.     A variety of circumstances contributed to the unacceptable level of risk born by Plan participants as a result of the Plans' massive investment in Merrill Lynch stock, including, but not limited to:

- Merrill Lynch's rapid expansion into high-risk financial products without putting in place the business skill-set to manage and understand the corresponding risk and its changing nature;

- Merrill Lynch's dramatic increase in exposure to subprime-backed securities throughout the Class Period, despite recognizable signs of distress in the housing market, including rapidly rising delinquency rates on subprime loans;

- The Company's aggressive growth of its CDO business, even as credit markets deteriorated and subprime mortgage defaults increased, although the head of Merrill's CDO group had budgeted for zero growth in 2006;

- The loss of the core of its CDO group, including its leader Christopher Ricciardi, in February 2006, which left Merrill Lynch with a void of senior managers capable of overseeing the increasingly significant risks created by CDO underwriting;

- The deteriorating market for CDO and subprime mortgage-backed investments, which forced Merrill Lynch to accumulate a significant concentration in subprime residential mortgage and asset-backed securities, as it continued its underwriting activities through 2006 and 2007;

- The continued inflation of asset value due to the Company's calculating their worth based on assumptions disregarding the actual housing market, credit market, and liquidity conditions affecting the value of subprime and asset-backed securities;

- The sheer magnitude of Merrill Lynch's subprime exposure, which made it difficult, if not impossible, to shield the Company from substantial losses when the subprime industry collapsed;

- The Company's failure to implement a Chief Risk Officer position until September 10, 2007; and,

- The Company's false and misleading statements regarding the dire circumstances it faced as a result of its CDO and sub-prime investment practices, which caused the price of Merrill Lynch stock to be artificially inflated.

97.     The risk of significant loss to the Plans was exacerbated by the fact that Merrill Lynch stock constituted a significant portion of the Plans' total assets, as illustrated above in Section V.D. Astonishingly, given the purpose of the Plans – to allow employees to save for retirement – and the profound risk the Company faces due its subprime and CDO exposure, the Plans' fiduciaries did not undertake any meaningful action to protect the Plans from the massive losses that have been caused by the Plans' holding billions of dollars of Merrill Lynch stock while exigent circumstances have beset Merrill Lynch during the Class Period. For example, the Plans' fiduciaries continued to offer Merrill Lynch stock as an investment option, and purchased additional shares even during the time that the stock was plunging in value as a result of the collapse of the CDO and subprime markets. A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans' assets were decimated.

2.      **Merrill Lynch's Plunge Into High Risk Securities Speculation.**

98.     Between 2003 and 2006, Merrill Lynch undertook a dramatic transformation of its Fixed-Income, Currencies and Commodities ("FICC") business, shifting from its traditional focus on interest rate and credit products to riskier financial instruments, including derivatives and subprime mortgage origination.

99.     The transformation centered on Merrill Lynch's rapidly increasing involvement with underwriting CDOs, resulting in Merrill Lynch's ascent from "from bit player to powerhouse in the lucrative business of bundling loans into salable securities." Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03,*

*Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007. The CDO business was spearheaded by a young banker, Christopher Ricciardi, who joined Merrill Lynch in 2003. As Managing Director and Head of Global Structured Credit Products for the Company, he was responsible for the origination and structuring of all CDOs, Structured Funds and Structured Credit Derivatives. Ricciardi led Merrill Lynch to its position as the top Global underwriter of CDOs in 2003, 2004, and 2005. *Id.*

100.    Bundling loans into salable securities involves significantly more risk and uncertainty than traditional interest rate and credit products. CDOs hold inventories of asset-backed or income securities at various risk levels. Underwriters then market rights to the income from these various levels in tranches set by debt type and risk levels. The securities are inherently complex and their values depend on several variables, including market, credit, liquidity, and other market conditions affecting the various constituent securities.

101.    The securities became increasingly popular in the early 2000's, when low interest rates made regular bond yields less attractive and spurred significant growth in consumer and mortgage borrowing.

102.    Despite these factors, Merrill Lynch rushed forward into the CDO market without establishing sufficient risk-management processes to safeguard its business and to limit its exposure to market volatility.

103.    A central component of Merrill Lynch's CDO underwriting was the bundling of subprime mortgage securities into CDO products. "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio, or an extended period for repayment, or describe loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan

terms.  To create liquidity for these subprime mortgages, lenders combined them with other asset-backed securities into CDOs.

### 3.    The Deteriorating Market Environment.

104.    Housing market troubles emerged in 2005, but Merrill Lynch continued its aggressive underwriting of CDOs, as its total "soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages." *Id.*

105.    Subprime mortgage exposure grew even riskier in 2006, when the subprime lenders further lowered their standards, sourcing no-documentation and low-documentation loans, known in the industry as "liar loans."  This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.  Gretchen Morgenson, *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007.  Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.  *Id.*

106.    The slowdown in the market for subprime-backed securities was well known. According to an article in the Wall Street Journal, Ricciardi, then still head of the CDO group, budgeted for no growth in 2006.  Ng and Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities, supra.*.  Ricciardi departed in February 2006 and, despite his prognostication for 2006, Dow Kim, Executive Vice-President and Co-President of the Company's Global Markets and Investment Banking Group, pushed Merrill Lynch deeper into the CDO market.

107.    Later that year, Kenneth Bruce, Merrill Lynch's own analyst, warned his clients that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.

Bruce specifically warned that an "asset fire-sale" could cause prices to fall.    Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Markets*, Reuters, Sept. 26, 2006.

108.    Despite the market conditions, Merrill Lynch moved to extend its lead in underwriting mortgage-backed CDOs throughout 2006 and expanded its exposure to subprime mortgages in December 2006, paying $1.3 billion to buy First Franklin, a mortgage company which catered to subprime borrowers.    As *Reuters* reported: "The First Franklin deal puzzled analysts because the market for subprime loans was souring in a hurry when the deal was announced.    Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."    Al Yoon, *Merrill's Own Subprime Warnings Unheeded*, Reuters, Oct. 29, 2007.

**4.    Merrill Lynch's Persistent Failure to Manage Risk.**

109.    As Merrill Lynch dove ever deeper into the unsteady subprime waters, it extended its failure to establish or maintain adequate risk-assessment processes or risk-management strategies.    This failure extended to the Board of Directors, which, despite its charge to ensure the Company's long-term value, failed even to ask the simple question of what would happen to Merrill Lynch's $40 billion CDO and subprime-mortgage exposure if and when the credit market retrenched.

110.    The institutional failure to manage the Company's risk exposure stems in part from Defendant O'Neal's personnel decisions and appetite for risk, which the Board condoned until its brutal consequences were publicly revealed in October 2007.

> During his five-year tenure, Mr. O'Neal has been criticized for making such extensive cuts in Merrill's costs and former brain trust that the firm lost its institutional memory of how to manage its risks.    Mr. O'Neal ousted one of the firm's top capital-markets executives, Arshad Zakaria, in 2003 after concluding that he was campaigning to become Merrill's

31

president. And he approved the replacement of a group of senior capital-markets executives led by Jeffrey Kronthal with a younger, most risk-prone team led by 39-year-old Osman Semerci.

Randall Smith, *Merrill Loss May Be Wider Than Projected*, Wall St. J., Oct. 24, 2007.

111. The systemic risk-management failure was exacerbated by personnel turnover within the CDO group in early 2006 and persisted even after deteriorating credit market and housing market conditions were broadly recognized in late 2006. The new group of CDO managers, even less experienced than their predecessors, pushed Merrill Lynch even deeper into the subprime quagmire.

### 5. During the Class Period, Merrill Lynch Disseminated Incomplete and Inaccurate Information to Participants in the Plans.

112. Throughout the Class Period, Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes to Plan participants. These false statements caused the price of Merrill Lynch stock to be artificially inflated during the Class Period.

113. On January 18, 2007, Merrill Lynch reported its financial results for fourth quarter and full year 2006, in a release in which Defendant O'Neal touted: "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent." On that date, the Company's stock closed at $95.40 per share.

114. On February 26, 2007, Merrill Lynch falsely represented that its "risk management and control process ensures that our risk tolerance is well-defined and understood

by our businesses as well as by our executive management." Merrill Lynch Annual Report

(Form 10-K) (Dec. 31, 2006). On that date, the Company's stock closed at $86.66 per share.

115. Merrill Lynch also understated its exposure to subprime mortgages, failing to

disclose the actual exposure faced due to CDO and subprime holdings at Merrill Lynch affiliates,

which the Company would have to include in its own financials, given the increasingly illiquid

market for the securities. On May 7, 2007, the Company reported that:

> Retained interests in securitized assets were approximately $8.7 billion
> and $6.8 billion at March 30, 2007 and December 29, 2006, respectively,
> which related primarily to residential mortgage loan and municipal bond
> securitization transactions. The majority of the retained interest balance
> consists of mortgage-backed securities that have quoted market prices.
> The majority of these retained interests include mortgage-backed
> securities that Merrill Lynch expects to sell to investors in the normal
> course of its underwriting activity, and only a small portion of the retained
> interests represent residual interests from subprime mortgage
> securitizations.

Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 30, 2007).

116. In July 2007, Merrill Lynch reported its second-best ever net revenues for the

FICC business, but failed to account for the actual valuation of the Company's warehouse of

increasingly illiquid CDOs. On the contrary, Merrill Lynch continued to tout the CDO business,

citing "continued innovation in the CDO space, including the development of unique new CDO

products" among the second quarter highlights for FICC. *Merrill Lynch Second Quarter 2007*

*Analyst Conference Call,* July 17, 2007, at 5 (available at

http://files.shareholder.com/downloads/MER/197622170x0x119440/aff5f976-459c-4bf8-8343-

0f18e9efaad1/blank.pdf).

117. Merrill Lynch also re-affirmed its risk-management capabilities. Chief Financial

Officer, Jeffrey N. Edwards, who was responsible for the Company's independent risk groups,

explained that: "[w]hile we have seen some positive signals ...the environment for U.S. sub-prime mortgages and related CDOs has yet to fully stabilize.  Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and *ours have proven to be effective in mitigating the impact on our results*." *Id* (emphasis added).

118.    On the news of Merrill Lynch's outstanding second quarter performance, the stock closed at $86.20 per share.

119.    Despite these repeated public assurances, Merrill Lynch failed to implement any effective risk-management or risk control strategies and, despite its knowledge of the deteriorating market conditions, the Company stuck itself with a massive inventory of shoddy investments that it could not market.

### 6.    The Collapse of Subprime Industry.

120.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes and the interest rates on variable rate loans, including mortgage loans, began to rise.  Subprime borrowers who were able to afford the initially low "teaser rate" loan payments no longer could meet their monthly payment obligations.  At the same time, home values began to decline sharply, leading some borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell the property for a profit.  As a result, many borrowers no longer paid their mortgages, causing defaults to increase significantly.  The widespread failure of the subprime mortgages that underlie CDOs and other mortgage-backed securities impaired the value of those securities.

121.    The imminent collapse of the subprime lending industry was widely-documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure For 1*

*In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from SEC and FDIC, and resulting in several bankruptcy filings.  In this financial environment, Merrill Lynch exposed itself to unacceptable risk by continuing to place massive bets on subprime-backed CDOs.

122.    The subsequent collapse of the subprime lending industry – which was in full swing by March of 2007 – signaled that securities and derivative instruments backed by subprime and other high-risk asset-backed securities were highly risky.  Indeed, on March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, U.S. subprime borrowers fell behind in their mortgages at the highest rate in over four years—up nearly a point from the previous quarter—and that foreclosures had jumped to an all-time high. James Tyson, *Senate Weighs Aid to 2.2 Million Subprime Borrowers,* Bloomberg News, Mar. 13, 2007.

123.    Reacting to this environment, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market.  Defendant O'Neal unequivocally dismissed those concerns.  O'Neal's statements were both highly misleading and careless particularly in light of the Plans' massive investment in Merrill Lynch stock.  As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.
>
> But speaking Thursday in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed … and it's not consistent with what I would assess the state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007.

124.    Despite the deteriorating credit market, Merrill Lynch continued underwriting CDOs based on subprime mortgage-backed securities and risky asset-backed securities. As late as May 2007, Executive Vice-President Kim vowed that "we are growing our leading CDO business." *See* Greg Fleming and Dow Kim, *UBS 2007 Financial Services Conference*, May 14, 2007 (available at http://files.shareholder.com/downloads/MER/197622170x0x97888/03afadb6-5688-42f9-a26e-33457bfee007/UBS).

### 7.    Merrill Lynch's Reckless Business Practices Come to Light.

125.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs. The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim. *Bloomberg News* also reported that: "The company severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses." Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.

126.    Unfortunately, the damage to its business had already been done. On October 5, 2007, Merrill Lynch announced that it would take an estimated $4.5 billion loss on CDOs and related to the Company's subprime exposure. Defendant O'Neal, who earlier dismissed credit market concerns in a July 2007 memo to employees, addressed Merrill Lynch employees via video and "took pains to pinpoint the date that the credit crunch worsened as the day in early August when European central banks first stepped in to provide liquidity to the banking system, indicating how much conditions had deteriorated." Smith, *Merrill Loss May Be Wider Than Projected, Supra.*

127.    Despite Defendant O'Neal's protestations, the grave risk was previously known and ignored.    As alleged above, analysts had previously pointed out the risk of subprime exposure in September 2006 and April 2007.  According to the *New York Times*, Merrill Lynch's Board of Directors had been informed of its subprime exposure and CDO obligations in July 2007. *Id.*  Despite the Company's vast exposure to CDOs and subprime, the Board failed to take any action to decrease the risks faced by the Company and the Plans.

128.    "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."  Or, as stated by one corporate and securities law professor "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't."  Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

129.    As summarized by Brian Foley, an executive compensation expert, ,the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around." *Id.*

130.    Defendant O'Neal shares this assessment.  On October 25, 2007, Merrill Lynch shocked the market by taking a massive write-down of $7.9 billion.  During a conference call announcing the results, Defendant O'Neal commented:

> Over the past few weeks, our FICC management team, led by David, has worked with out Finance staff to undertake a rigorous and comprehensive review of our remaining CDO and subprime related exposures.  This collective review has resulted in the use of more conservative valuation assumptions, and a total net write-down of approximately $7.9 billion for this quarter.

***

The bottom line is that we got it wrong by being over-exposed to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market.  No one, no one, is more disappointed than I am in the result.

***

Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that both our assessment of the potential risk and our mitigation strategies were inadequate

***

We're not, I'm not, going to talk around the fact that there were some mistakes that were made.  We, I am accountable for these mistakes, just as I am accountable for the performance of the firm overall.  And my job, our job, the leadership team's job − is to address where we went wrong and what changes were necessary, to make sure that we respond to changes in risk dynamics early, correctly, and in every asset class at every stage of the market's evolution.

***

So, as I have mentioned, we have made a number of important changes....

*Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007 (available at http://files.shareholder.com/downloads/MER/197622170x0x139158/ea4f7956-7c53-4e86-86a4-f8f17f023245/blank.pdf).

131.    During the conference call, Defendant O'Neal reiterated the Company's failure to manage its risk and warned that additional write-downs were a possibility.  *Id.*

132.    Despite the magnitude of the announcement, both Defendant O'Neal and Merrill Lynch's Chief Financial Officer, Edwards, refused to provide complete, straight-forward information regarding the Company's disposition of its inventory of CDOs.  Analysts questioned the executives about the $11 billion chunk of CDO left unaccounted for by the write-down from $32 billion to $15 billion.  Defendant O'Neal repeatedly refused to comment.  A Lehman Brothers analyst asked whether the existing CDO exposures are held in broker / dealer accounts

or on the Company's balance sheet. Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient." *Id.*

133.    During the analyst call, Standard & Poor's announced that it had downgraded Merrill Lynch's debt to A+ from AA-.   Merrill Lynch shares fell 5.7%, causing further significant losses to the Plans.

134.    Neither Defendant O'Neal nor Edwards could explain why the Company's write-down of asset values – based on a fixed date in time – had nearly-doubled in only three weeks. In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time." If that statement is true, it is reasonable to infer that the Company realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

135.    The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's stock.  News articles chronicled the FICC business' recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

136.    On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had retired, effective immediately.  That day, the Company's stock closed at $65.56 per share, down from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

137.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure – through hedging or selling CDO inventory – and the financial press

reported that the SEC was investigating reports that Merrill Lynch had engaged in transactions

with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.

138.    The Company immediately denied that it had entered into such transactions.  On

the same day the *Wall Street Journal* article appeared, the Company issued a press release:

> The story is nonspecific and relies on unidentified sources. We have no
> reason to believe that any such inappropriate transactions occurred. Such
> transactions would clearly violate Merrill Lynch policy.

Merrill Lynch, *Merrill Lynch Responds to Wall Street Journal Story*, Business Wire,
Nov. 2, 2007.

139.    Five days later, on November 7, 2007, the Company issued it quarterly report on

Form 10-Q for the third quarter.  The securities filing did not address the *Wall Street Journal*

article, but stated: "[o]n October 24, 2007, the SEC staff initiated an inquiry into matters related

to Merrill Lynch's subprime mortgage portfolio. Merrill Lynch is cooperating fully with the SEC

in this matter." Merrill Lynch Quarterly Report (Form 10-Q) (Sept. 30, 2007).

140.    On November 26, 2007, the *Wall Street Journal* issued a correction,

> ON NOV. 2, the Journal published a page-one article on Merrill Lynch &
> Co. that was based on incorrect information that the firm had engaged in
> off-balance-sheet deals with hedge funds in a possible bid to delay the
> recognition of losses connected to the firm's mortgage-securities exposure.
> In fact, Merrill proposed a deal with a hedge fund involving $1 billion in
> commercial paper issued by a Merrill-related entity containing mortgage
> securities. In exchange, the hedge fund would have had the right to sell the
> mortgage securities back to Merrill after one year for a guaranteed mini-
> mum return. However, Merrill didn't complete the deal after the firm's fi-
> nance department determined it didn't meet proper accounting criteria. In
> addition, Merrill says it has accounted properly for all its transactions with
> hedge funds.

*Corrections & Amplifications*, Wall Street Journal, Nov. 26, 2007.

141.    The correction apparently assuages doubts about Merrill's accounting for the $1

billion hedge-fund transaction previously reported, but it neither resolves the ongoing SEC

inquiry into the Company's subprime mortgage portfolio nor mitigates the damage finally revealed on the Company's day of subprime reckoning. In fact, it confirms that Merrill itself "proposed" the extraordinary hedge fund deal, designed to conceal its actual financial condition.

142.    Analysts continue to speculate that the Company has not come clean regarding the full extent of its past shenanigans and its exposure to subprime-backed securities and CDOs. Some analysts are predicting that the Company faces up to an additional $10 billion in write-downs. Evelyn Rusli, *Morgan Stanley: It Could've Been Worse*, Forbes, Nov. 8, 2007. Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill. It's not enough to say the CEO has gone, problem fixed." Bowley and Anderson, *Where Did the Buck Stop at Merrill?, supra*. The SEC investigation and the possibility of enforcement action against Merrill Lynch raises even further the unacceptable level of risk faced by Plan participants as a result of the Plans' enormous investment in Merrill Lynch stock.

**B.    Defendants Knew or Should Have Known That Merrill Stock Was an Imprudent Investment.**

143.    Given the factors described above, it is clear that since the beginning of the Class Period, Merrill Lynch was engaged in a perilous business strategy, was being seriously mismanaged and faced dire risk due to its subprime and CDO exposure. Ignoring these problems, and indeed, attempting to conceal them with false and misleading statements which caused the price of Merrill Lynch stock to be artificially inflated, exacerbated the problems. In the end, when the severity of the circumstances came to light, the Plans suffered staggering losses, all or some which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

144.    At all relevant times, Defendants knew or should have known that Merrill Lynch stock was an imprudent investment for the Plans due to the numerous operational problems and risk management deficiencies described above.  Defendants disregarded sound business practices and failed to implement risk-management processes despite the numerous warnings from industry observers and regulators regarding the risks of subprime markets and looming trouble in credit markets.  Merrill Lynch reportedly also engaged in improper transactions that artificially inflated the price of Company stock and were designed to hide the Company's true financial condition.

145.    Accordingly, it was imprudent for the Plans' fiduciaries to continue offering Merrill Lynch stock as a Plan investment option, holding Merrill Lynch stock in the Plans, and/or making new investment in Company stock during the Class Period.  Merrill Lynch stock was an imprudent investment for the Plans as it posed an inordinate risk of significant loss, and this risk is not one that should have by the participants and beneficiaries of the Plans.  The Plan fiduciaries disregarded the Company's deteriorating financial circumstances when it came to managing the Plans' investment in Merrill Lynch stock, and were unwilling or unable to act prudently to rescue the Plans' investments.  Under the circumstances, the continued investment of billions of dollars of participants' retirement savings in Merrill Lynch stock was reckless and imprudent, and contrary to the best interests of the Plans' participants and beneficiaries.

146.    Despite these facts, Defendants took no meaningful action to protect the heavily Merrill Lynch-invested Plans and their participants from the significant losses that they have incurred.

147.    During the Class Period prudent fiduciaries of the Plans would not have ignored the circumstances and allowed the risk of loss to the Plans' participants and beneficiaries to

increase to unacceptable levels. Unfortunately, the Defendants did exactly that and for all intents and purposes wiped out a significant portion of the Plans' assets.

148.    As Directors of the Company, the Director Defendants and the Compensation Committee Defendants knew or should have known of the existence of the above-mentioned problems.

149.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

150.    Defendants failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and failed to provide the Plans' participants with information regarding Merrill Lynch's risky business plan so that participants could make informed decisions regarding their investments in Company stock in the Plans.

151.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Merrill Lynch stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

152.    Because Defendants knew or should have known that Merrill Lynch stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Company stock.

153.   Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Company stock; discontinuing further contributions to and/or investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Merrill Lynch they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

154.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in Merrill Lynch stock.

**C.     Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Merrill Stock in the Plans.**

155.   ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

156.   During the Class Period, on information and belief, Defendants made direct and indirect communications with participants in the Plans which included statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan Documents and/or Plan-related materials, and, thus, were Plan communications undertaken in a

fiduciary capacity, in which Defendants failed to disclose that Company stock was not a prudent retirement investment. The Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plans.

157. Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

(a). Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b). Out of loyalty, employees tend to invest in company stock;

(c). Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d). Employees tend not to change their investment option allocations in the plan once made;

(e). No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f). Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g). Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k)*

*Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans - the Importance of Plan Design*, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series, No. 2002-36 (2002) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236 pap.pdf).

158.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and their participants from their heavy investment in an imprudent retirement vehicle, Merrill Lynch stock.

159.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plans could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

160.    Specifically, Defendants failed to provide the Plans' participants with complete and accurate information regarding the Company's unduly risky sub-prime and CDO investments, the true impact of such investment on the Company financial condition, and the dire circumstances such investments have created for the Company, and the Plans' investment in Merrill Lynch stock.  As such, the participants were not informed of the true risks of investing their retirement assets in the Plans in Merrill Lynch stock.

**D.    Defendants Suffered From Conflicts of Interest.**

161.    As ERISA fiduciaries, Defendants are required to manage the Plans' investments, including the investment in Merrill Lynch stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

162.    Conflicts of interest abound when a company that invests plan assets in company stock founders.  This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).  Here, Defendants breached this fundamental fiduciary duty.

163.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plans, and instead, chose the interests of the Company over the Plans by continuing to offer Merrill Lynch stock as an investment option for the Plans, and maintain investment in Merrill Lynch stock in the Plans.  Moreover, while certain Defendants, such as Defendant O'Neal, dumped over 474 thousand shares of Merrill Lynch stock that he personally held for proceeds of over $44.5 million during the Class Period, they did nothing to protect the Plans from losses due to the Plans' imprudent investment in Merrill Lynch stock.

### VIII.  THE RELEVANT LAW

164.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

165.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

166.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

167.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

168.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Merrill Lynch Stock Fund, which invested in Merrill Lynch stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

169.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

170.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

171. Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## IX. ERISA § 404(c) DEFENSE INAPPLICABLE

172. ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

173. ERISA § 404(c) does not apply here for several reasons.

174.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Merrill Lynch stock as an investment option in the Plans as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

175.    Second, ERISA § 404(c) does not apply to any Merrill Lynch stock in the Traditional ESOP Plan, or any component of the others Plans which purport to be ESOPs, as Plan participants do not have any control over the decision to invest Plan assets in Merrill Stock in such Plan and Plan components. Instead, the Plan fiduciaries controlled such assets.

176.    Third, even as to participant-directed investment in Merrill Lynch stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Merrill Lynch stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Merrill Lynch stock as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

177.   Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, the Plaintiff and the Class (as defined below) for losses caused by the Plans' investment in Merrill Lynch stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## X.   DEFENDANTS' INVESTMENT IN MERRILL LYNCH STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

178.   Some courts have applied a presumption of prudence to decisions by plan fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder. The presumption is based on the dual purpose of an ESOP to allow employee ownership on the one hand, and save for retirement on the other. *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to balance these concerns).

179.   As these courts have made clear, when a presumption of prudence applies, "[a] Plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

180.   Plaintiff disputes that the Plans qualify as ESOPs.  Nonetheless, even if the Merrill Lynch Stock Fund components of the Plans are deemed ESOPs, any presumption of prudence on the part of Defendants' decisions to make and maintain investment in Merrill Lynch stock is overcome by the facts alleged here, including, among other averments:

- A precipitous stock price decline from over $95 to under $52 during the Class Period;

- Risk of further imminent collapse of the Company's stock price based on the Company's practices as described in detail herein;

- Serious, if not gross, mismanagement evidenced by, among other things,

    - rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks;

    - persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth;

    - inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions; and

    - artificially inflating the Company's share price, through improperly accounting for its CDO portfolio and other related subprime holdings and incomplete and inaccurate statements regarding the dire circumstances faced by the Company as a result of its improper actions.

181.    The imprudence of continued investment by Defendants in Merrill Lynch stock during the Class Period under the circumstances present here is recognized in Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1. Defendants had available to them investment alternatives to Merrill Lynch stock that had either a higher rate of return with risk commensurate to Merrill Lynch stock or an expected rate of return commensurate to Merrill Lynch stock but with less risk.

182.    Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Merrill Lynch stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result of such investment during the Class Period.

## XI.  CAUSES OF ACTION

**A.    Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans**

183.    Plaintiff incorporates by this reference the paragraphs above.

184.    This Count alleges fiduciary breach against the following Defendants:  the Compensation Committee Defendants, the Investment Committee Defendants, and the Senior Vice President, Leadership and Talent Management Defendant (the "Prudence Defendants").

185.    As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

186.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

187.    Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans.  Specifically, during the Class Period, these Defendants knew or should have known that Merrill Lynch common stock no longer was a suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of the Company's improper business practices, serious mismanagement, misstatement and omissions that caused the price of Merrill Lynch stock to be artificially inflated, and the impending collapse of the price of the stock as a result of these dire circumstances.  Nonetheless, during the Class Period, these Defendants continued to offer Merrill Lynch stock as an investment option for participant contributions, provide Retirement Contributions in Merrill Lynch stock, and maintain the Plans' enormous investment in the stock.

188.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.  In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

189.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Merrill Lynch stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plans.  Such an investigation would have revealed to a reasonably prudent

fiduciary the imprudence of continuing to make and maintain investment in Merrill Lynch stock under these circumstances.

190.    The Prudence Defendants' decisions respecting the Plans' investment in Merrill Lynch stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Merrill Lynch stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

191.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

192.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

193.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

194.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Merrill Lynch stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plans: (a) rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks; (b) persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth; (c) inflating the value of the

Company's asset-backed portfolio by calculating their worth without regard to actual market conditions; and (d) artificially inflating the Company's share price through improperly accounting for its CDO portfolio and other related subprime holdings, and through incomplete and inaccurate statements regarding the dire circumstances faced by the Company as a result of its improper actions.

- The risk associated with the investment in Merrill Lynch stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plans' participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plans or any participant from investing the Plans' assets in Merrill Lynch stock; and

- Further, knowing that the Plans were not diversified portfolios, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

195.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Merrill

Lynch stock and/or the publicly reported financial performance of Merrill Lynch. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

196.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investment in Merrill Lynch; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Merrill Lynch stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Merrill Lynch's inappropriate practices; and by otherwise placing their own and Merrill Lynch's improper interests above the interests of the participants with respect to the Plans' investment in Merrill Lynch stock.

197.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the other Class members, lost over one billion dollars of retirement savings.

198.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II:  Failure to Monitor Fiduciaries**

199.    Plaintiff incorporates by this reference the allegations above.

200.    This Count alleges fiduciary breach against the following Defendants: the Director Defendants and the Senior Vice President, Human Resources Defendant (the "Monitoring Defendants").

201.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

202.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| HR Defendant | Investment Committee Defendants and Administrative Committee Defendants. | ¶¶ 83-84 |
| Director Defendants | Compensation Committee Defendants; Senior Vice President, Human Resources; and Senior Vice President, Leadership and Talent Management. | ¶¶ 76-77 |

203.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

204.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

205.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

206.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Merrill Lynch's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Merrill Lynch stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets;

and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Merrill Lynch stock despite their knowledge of practices that rendered Merrill Lynch stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

207.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the other Class members, lost over one billion dollars of retirement savings.

208.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries.**

209.    Plaintiff incorporates by this reference the allegations above.

210.    This Count alleges fiduciary breach against Merrill Lynch and the Administrative Committee Defendants (the "Communications Defendants").

211.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

212.    At all relevant times, the scope of the fiduciary responsibility of the Defendants

included the communications and material disclosures to the Plans' participants and beneficiaries.

213.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all of the Plans' investment options, including investment in Merrill Lynch stock.

214.    Because investments in the Plans were not diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Merrill Lynch stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Merrill Lynch stock.

215.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Merrill Lynch's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Merrill Lynch stock, and, generally, by conveying incomplete information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity.  These failures were particularly devastating to the Plans and their participants; a heavy percentage of the Plans' assets were

invested in Merrill Lynch stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

216.    Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plans' investment in Merrill Lynch stock.

217.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plans' participants.

218.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

219.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

220.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV: Co-Fiduciary Liability**

221.    Plaintiff incorporates by this reference the allegations above.

222.    This Count alleges co-fiduciary liability against the following Defendants: all Defendants (the "Co-Fiduciary Defendants").

223.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

224.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

225.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

226.    Merrill Lynch, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Merrill Lynch as a matter of law.

227.    Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Merrill Lynch's failed and

inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

228.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Merrill Lynch knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Merrill Lynch stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

229.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

230.    The Monitoring Defendants' failure to monitor the Prudence Defendants, particularly the Administrative and Investment Committees, enabled those committees to breach their duties.

231.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost over one billion dollars of retirement savings.

232.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII. CAUSATION

233.    The Plans suffered nearly two billion dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Merrill Lynch stock during the Class Period, in breach of Defendants' fiduciary duties.

234.    Defendants are liable for the Plans' losses in this case because: (a) the Traditional ESOP's investment in Merrill Lynch stock was the result of the Prudence Defendants' decision to invest Company contributions in Merrill Lynch stock; and (b) as to the portion of 401(k) Plan's and the RAP's assets invested in Merrill Lynch stock as a result of participant and/or Company contributions, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

235.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Merrill Lynch stock as an investment alternative when it became imprudent, and divesting the Plans of Merrill Lynch stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they, and indirectly, the participants suffered.

## XIII.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

236.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Merrill Lynch stock during the Class Period.

237.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

238.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

239.    With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Merrill Lynch stock that the Plans would have acquired had the Plan fiduciaries taken appropriate steps to protect the Plans.  The Court should adopt the measure of loss most advantageous to the Plans.  In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

240.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans

resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

241.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XIV. CLASS ACTION ALLEGATIONS

242.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff and the following class of persons similarly situated (the "Class"):

243.    All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between January 18, 2007 and the present and whose accounts included investments in Merrill Lynch stock.

244.    **Class Period.**  The fiduciaries of the Plans knew or should have known at least by January 18, 2007 that the Company's material weaknesses were so pervasive that Merrill Lynch stock could no longer be offered as a prudent investment for retirement Plans.

245.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiff

at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, based on the Plans' Form 5500s for Plan year 2005, over 57 thousand participants or beneficiaries in the SIP, and over 47 thousand participants in both the RAP and the Traditional ESOP.

246.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans have suffered losses and, if so, what is the proper measure of damages.

247.    **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiff seeks relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

248.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action,

complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

249.   **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

250.   **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.   A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.   An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans

resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Merrill Lynch stock;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated:  November 29, 2007

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

By: _____
    Lynda J. Grant (LG-4784)
    150 East 52nd Street
    Thirtieth Floor
    New York, NY 10022
    Telephone:  (212 838-7797
    Facsimile:  (212) 838-7745

Steven J. Toll
Bruce F. Rinaldi
1100 New York Avenue, NW
Suite 500 West
Washington, DC  20005-3964
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

Marc I. Machiz
1 South Broad Street
Suite 1850
Philadelphia, PA 19107
Telephone:  (215) 825-4016
Facsimile:  (215) 825-4001

**KELLER ROHRBACK L.L.P**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
Tyler L. Farmer
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

*Counsel for Plaintiffs*